## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COOKEVILLE DIVISION

| | |
|---|---|
| DOUG LITTLEFIELD, ROBERT MOLLEUR, | ) |
| And RODNEY BARRUP, | ) |
|     Plaintiffs, | ) |
| v. | ) Case No. 2: 06-0061 |
| CARL BENSON TILLEY, KATHERINE | ) |
| TILLEY, TILLEY FOUNDATION INC. | ) JURY DEMAND (12) |
| (a Tennessee corporation), and CT TECHNOLOGY, | ) |
| INC. (a Nevada corporation), | ) |
|     Defendants. | ) |

## DEFENDANTS TILLEY AND TILLEY FOUNDATION, INC.'S
## NOTICE OF FILING AFFIDAVITS, EXHIBITS AND UNPUBLISHED CASES

COME THE DEFENDANTS CARL TILLEY, RUTH TILLEY & TILLEY

FOUNDATION, INC. ("the Defendants"), by and through counsel, and give notice of

filing the following items in support of their Response to Plaintiffs' Application for

Preliminary Injunction and in support of their Motion to Dismiss:

    1.    Affidavit of Carl Tilley with 4 exhibits

    2.    Affidavit of Katherine Tilley with 2 exhibits

    3.    Holloman v. Metro Gov't, 2006 U.S. Dist. LEXIS 28076 (M.D. Tenn.

2006)(Campbell, J.)

    4.    D.B. v. Lafon, 2006 U.S. Dist. LEXIS 44874 (E.D. Tenn. 2006)

This the 30th day of July, 2006.

                Respectfully submitted,

                /s/ Henry D. Fincher
                Henry D. Fincher (No. 16682)
                305 East Spring Street
                Cookeville TN 38501

1

(931) 528-4000

Attorney for the Defendants Carl Benson Tilley,
Katherine Tilley and the Tilley Foundation, Inc.

## CERTIFICATE OF SERVICE

I certify that I have caused a true and correct copy of the foregoing to be served upon counsel for the Plaintiffs, Hon. G. Kline Preston IV, KLINE PRESTON GROUP, P.C., 4525 Harding Road, Ste. 200, Nashville TN 37205, by filing with the Middle District of Tennessee's CM/ECF filing system, this the 30th day of July, 2006.

/s/ Henry D. Fincher .
Henry D. Fincher

2

# AFFIDAVIT OF CARL TILLEY

STATE OF TENNESSEE    )
COUNTY OF SMITH      )

     1.     I am over the age of eighteen (18) years and have personal knowledge of the facts stated herein.

     2.     My wife, Katherine Tilley, and I are senior citizens who live in rural Smith County at 131 Hiwassee Road, Lebanon Tennessee.

     3.     I invented technology that produces superior results and performance in electric motors. This technology has been the subject of controversy since its existence became known. The technology has been tested and proven a number of times in private testing. The technology has been offered for sale for years but due to various lawsuits and investigations has not been sold yet. The technology has been protected by "trade secret" methods (i.e., kept under wraps) and not by a patent. This decision was known and approved by the board of the Tilley Foundation, Inc., and has been known to the shareholders since I made this decision in 2002. We chose to rely upon trade secret protection or so due to the difficulty of defending patent lawsuits. Mr. Littlefield knew or should have known since at least August 2002 that no patent was contemplated or desired by me. Mr. Moeller and Mr. Barrup knew or should have known by May 2003 that no patent was contemplated or desired by me or the Board of the Tilley Foundation, Inc.

     4.     In late 2002, fraud allegations were raised against me and the Tilley Foundation, Inc. Two (2) of my former associates – Robert Kibbey and Walter Webb filed suit in state court claiming that my technology did not work and that I had engaged in securities fraud. They even went on television with their claims in February 2003, appearing on WSMV Channel 4 – in express violation of a state court order prohibiting such appearances – and repeating their false claims. Both Mr. Kibbey and Mr. Webb later completely repudiated these claims and signed affidavits renouncing their claims. Mr. Littlefield, Mr. Moelleur and Mr. Barrup were aware of these allegations at the time they arose in late 2002.

     5.     Based on the initial allegations of Webb and Kibbey, the State of Tennessee, Division of Securities began an investigation into me, the technology, and the Tilley Foundation, Inc. Through my attorney, I offered to cooperate with the investigation and to provide the technology for testing. However, the State elected to obtain a search warrant in secret and to seize all documents and technology from me and the Tilley Foundation, Inc. The search was performed in May 2003 by the Tennessee Bureau of Investigation. The TBI took the technology and all documentation related to the Tilley Foundation, Inc., and took all of our records. Although ordered to return everything they took, the TBI did not return everything they took.

6.      For two (2) years the State of Tennessee reviewed the documents and the technology. In 2004, the Tilley Foundation, Inc., and I – with the full knowledge of the Plaintiffs - sued the State of Tennessee for failing to file charges and for return of the unlawfully seized property. In response to this lawsuit, the State of Tennessee indicted me on charges of theft, securities fraud and sale of unregistered securities – a paperwork violation that I never denied. It was just a mistake made out of ignorance of Tennessee law. I had never disputed the technical problem of selling stock without the benefit of counsel who was familiar with Tennessee's "Blue Sky" laws. In 2005, the State of Tennessee dismissed the theft and fraud charges and returned all property and documentation to me. I agreed to take judicial diversion only on the charge of selling unregistered securities because I have not committed any fraud. See Copy of judicial diversion application attached hereto as **Exhibit 1** and incorporated as if fully set forth herein. Judicial diversion is a Tennessee statutory procedure whereby a person charged with a crime pleads guilty to the offense, but if he satisfactorily completes a period of probation, the charges are expunged from his record. Thus, the State of Tennessee, after seizing all the technology and records of the Tilley Foundation, Inc. – the most invasive "discovery" imaginable – could not prove a case of securities fraud or theft, and settled for judicial diversion on a paperwork charge. No civil charges have ever been filed, instituted or processed by the State of Tennessee Division of Securities against me, my wife or the Tilley Foundation, Inc. Mr. Littlefield, Mr. Molleur, and Mr. Barrup knew or should have known all of these details at or near the time they happened.

7.      From 2002 until 2004, Mr. Littlefield, Mr. Molleur, and Mr. Barrup were active in the marketing of the technology and in the purchase and sale of stock in the Tilley Foundation, Inc. Plaintiff Doug Littlefield served as "broker" for the technology and claimed to have several significant buyers for the technology in the amounts of billions of dollars. See e-mails from Doug Littlefield to Carl Tilley, attached as **Exhibit 2** to this Affidavit and incorporated as if fully set forth herein. Plaintiff Bob Moeller and Plaintiff Doug Littlefield were aware of the actions by the Tennessee Bureau of Investigation in May 2003. Mr. Moeller and Mr. Littlefield arranged for me to relocate temporarily to the State of Vermont to work on a prototype device and participated actively in helping me modify an electric car using the technology.

8.      The Tilley Foundation, Inc., has a Board of Directors currently consisting of my wife and I, Ben Hogancamp, Joe Bolen, Esq., T.J. Dupree and Cecil Boswell. Thus, a majority of the Board of Directors are not related to or affiliated with my wife or me. Many of the shareholders of the Tilley Foundation, Inc., are residents of the State of Tennessee. The company holds annual shareholders' meetings, and recently held one at the company facility at 131 Hiwassee Road. The Tilley Foundation, Inc., is listed as an active corporation with the State of Tennessee Secretary of State and is current in all tax filings. See **Exhibit 3** attached to this Affidavit and incorporated as if fully set forth herein. The Board of the Tilley Foundation, Inc., has considered the allegations of made by the Mr. Littlefield, Mr. Molleur, and Mr. Barrup in this suit and has voted to employ joint counsel because it determined the charges lack merit. See **Exhibit 4** attached to this Affidavit and incorporated as if fully set forth herein.

9.     The last time I sold any stock in the Tilley Foundation, Inc., is 2003.  I am under a court order to not sell any unregistered securities as part of his diversion, and I have not and will not violate this requirement.

10.     My wife and I have no financial resources other than our Social Security payments and the real estate located at 131 Hiwassee Road, Lebanon Tennessee.

11.     The Tilley Foundation, Inc., has no liquid funds either, having used those funds to build improvements at 131 Hiwassee Road and on research and development expenses associated with the technology at issue in this case.  The funds raised from the sale of stock went into developing the prototypes, expenses for research and development, and construction of facilities for the operation of the Tilley Foundation, Inc.  Thus, the only asset that my wife, I or the Tilley Foundation, Inc., own related to the operation of the company is the real estate located at 131 Hiwassee Road, Lebanon TN that my wife and I own and the Tilley Foundation rents.

12.     No sale of the real property located on Hiwassee Road has been attempted nor is any contemplated.  The property is not listed with a real estate agent and no contracts for sale have been solicited or received.

13.     The technology works as advertised.  I stand by my claims regarding the technology and its revolutionary efficiency.  In my opinion, the technology does work; that the technology has permitted an electric car to run for hundreds of miles without having to recharge; that the technology has been tested by private entities and demonstrated to work as claimed; and that the technology will save fossil fuels and cut national energy consumption if it is mass produced.

14.     The only bank accounts on which I have signatory authority are for the accounts into which are deposited my Social Security funds earned over years of hard work and the disability payments drawn by my wife.

15.     The real property at 131 Hiwassee Road has an appraised value of $191,100.  Plaintiff Doug Littlefield, when serving as a broker for the Tilley Foundation, required a ten million dollar ($ 10,000,000.00) deposit to take the technology off the market, which is essentially what he requests with his injunction.  The prices requested by Mr. Littlefield for the technology was at least $ 15 billion.  See attached **Exhibit 1** consisting of emails sent to Carl Tilley from Doug Littlefield and are incorporated as if fully incorporated herein.

16.     Defending the dissolution suit will cost the Tilley Foundation, Inc., an estimated one hundred fifty thousand dollars ($ 150,000.00).  Fifty thousand dollars ($50,000.00) will pay for 250 hours of legal work at our attorney's normal and customary rate of $200 an hour.  Hiring experts to become familiar with the case, participate in discovery and testify will cost an additional fifty thousand dollars ($ 50,000.00).  It will take hundreds of hours of my time and at least 100 hours of the Board's time to handle

the many different problems caused by this dissolution suit, all of which we value at fifty thousand dollars ($ 50,000.00).

FURTHER AFFIANT SAITH NAUGHT.

_____
CARL BENSON TILLEY

Sworn to and subscribed to before me
This the 30th day of July, 2006.

NOTARY PUBLIC

My Commission Expires 8/26/2009



**EXHIBIT 1**

# IN THE CRIMINAL COURT OF TENNESSEE FIFTEENTH JUDICIAL DISTRICT

STATE OF TENNESSEE

VS.

COUNTY **Smith**

DOCKET # **04-222**

**CARL BENSON TILLEY**
DOB: **1-31-44**    SS# **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**

## REQUEST FOR ACCEPTANCE OF PLEA OF GUILTY
## PETITION TO WAIVE TRIAL BY JURY AND TO WAIVE AN APPEAL

1.  My full and correct name is **Carl Benson Tilley** and I am represented by **B. F. "Jack" Lowery**, attorney **X** who was hired to represent me who was appointed to represent me.

2.  Having received a copy of the indictment and discussed it with my attorney, I understand the nature of the charge(s) against me and any defenses that could be raised on my behalf.

3.  I understand the minimum and maximum penalties provided by law for each of the charge(s) to be:

| | Minimum Sentence/Minimum Fine | | Maximum Sentence/Maximum Fine | |
|---|---|---|---|---|
| Count 1. | **2 years** | $ | **4 years** | $ |
| Count 2. | **2 years** | $ | **4 years** | $ |
| Count 3. | **2 years** | $ | **4 years** | $ |
| Count 4. | **8 years** | $ | **12 years** | $ |
| Count 5. | | $ | | $ |
| Count 6. | | $ | | $ |
| Count 7. | | $ | | $ |
| Count 8. | | $ | | $ |
| Count 9. | | $ | | $ |
| Count 10. | | $ | | $ |

4.  My attorney has explained the difference between concurrent and consecutive sentences and I understand that the sentences imposed on me in this case can be concurrent or consecutive.

5.  I understand that my sentence upon a plea of guilty, if accepted by the Court, will be as follows:

**I plead guilty to (offense & statute)
as set out in case number above.**

| Count | | Sentence | Concurrent/Consecutive | Range | Fine |
|---|---|---|---|---|---|
| Count 1 | **Guilty** | **2 years** | | **30 %** | $ |
| Count 2 | **Nolle** | | | | $ |
| Count 3 | **Nolle** | | | | $ |
| Count 4 | **Nolle** | | | | $ |
| Count 5 | **Plea pursuant to 40-35-313** | **Suspended – Supervised probation for 1 year; if in** | | | $ |
| Count 6 | **compliance 2nd year unsupervised probation. State to remove lein on real property** | | | | |
| Count 7 | **and return all personal property seized within 30 days after plea.** | | | | $ |
| Count 8 | Defendant not to be involved in the sale of any unregistered | | | | $ |
| Count 9 | securities | | | | $ |
| Count 10 | | | | | $ |

(OVER)

_____
DEFENDANT'S SIGNATURE



**EXHIBIT 2**

## The Tilley's

**From:**      "Doug Littlefield" <dougl@pshift.com>
**To:**        "The Tilley's" <cktilley@bellsouth.net>
**Sent:**      Wednesday, August 14, 2002 1:47 PM
**Subject:**   Re: jets

Yeah, that's just great...the good news is they already aired the story that was positive...the other good news is the car trip will happen...the other good news is it will work....the rest of the good news will flow from there !!

My day has been sweet too, if I have to talk to one more semiliterate, condescending, pompous ass, self indulgent, know it all, asshole engineer I'm going to tear their head off, shit down their neck , use the head for a soccer ball, the eyes for marbles and the fingers for bait.....THERE...I feel better already !

And you all thought I was just some big teddy bear type with only kind words for everybody, didn't you .......

Doug

I

8/14/2002

**The Tilley's**

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Wednesday, August 21, 2002 2:45 PM |
| **Subject:** | Re: OH YEAAAAAAA |

I just spoke with Stu Rosner for 20 minutes !!!

Told him to think about 100 million for "building" technology.

Doug

I

8/21/2002

## The Tilley's

**From:** "Doug Littlefield" <dougl@pshift.com>
**To:** <mike@neptunejam.com>
**Cc:** "The Tilley's" <cktilley@bellsouth.net>
**Sent:** Sunday, August 25, 2002 9:39 AM
**Subject:** TEV Flash video

Good Day Michael:

My name is Doug Littlefield, I am involved with Carl Tilley and his magnificent project.
Carl sent me your flash video and asked me comment on same, having done so he asked me to make contact with you to see what we can do about one concern I have.

First, IT IS GREAT !!!

Michael, the only part of the message that concerns me is the use of the word "never"
in both places. Carl is drawing criticism from all quarters, often with the grossly wrong
and overworked argument the semiliterate use about "perpetual motion". I'd like to find
some words that identify the abilities Carl has unleashed without providing more cannon
fodder.

What do you think of something like "doesn't require fossil fuel" in the first location of "never"
and something like "drives for hundreds of miles without recharging".

After all, "never needs fuel" is slightly problematic as electricity is fuel, I know, I know ....not
in the conventional context of fuel .... I'm perhaps overly sensitive to the issue but I've also seen
 the emails that are coming in.

In the second area where "never" is used, "never needs to be recharged", in the literal sense
of those particular batteries you are basically correct , however, there will be a point in time
when batteries will no longer accept a charge from the "device"...batteries just don't last forever.
The battery bank will then require changing.....I know that's not recharging, but the implication

8/25/2002

of your statement is you just keep driving ... forever.

Michael, please don't take this as negativity .... I hope my points makes sense to you when you
look at it from the point of view of those that would discredit Carl and the idea simply from what
they read.....I think your Video addresses them very succinctly, but just don't want them to have
anything to use against us AND BELIEVE ME THEY ARE TRYING !

Thanks for your patience in considering my point of view, we sure do appreciate the time and
talent you put into it on our behalf and we look forward to the chance to use it on our site.
(In fact I would suspect there will be an opportunity to work with in the future you as regards
visuals like this as we introduce the rest of the technologies in the wings).

Sincerely,

Doug Littlefield
Director - Tilley Foundation Inc.

8/25/2002

**The Tilley's**

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Tuesday, August 27, 2002 1:05 PM |
| **Subject:** | Charlie Sherlock |

Carl:

I just told Charlie Sherlock not to call me again and hung up on him.
He called asking if I had received copies of the "building information"
you said you were mailing out last Tuesday.

I told him we all were putting the TEV as the top priority and that I haven't
seen a need to discuss the building with you as we've all been too busy with
9/7.

I then told him I wasn't pleased with his asking for a letter from you
authorizing
Prudential Securities to make contact with General Electric. He said he is
expecting
the letter in time for Prudential to get GE to come down on the 7th. I asked
why he
needed Prudential and he said "they have access to the top", I told him "big
shit"
so do I....

I told him he just doesn't get it, he should not be keeping me out of the loop. I
asked
him how Prudential was going to get paid, further if it was to be out of the
agreement
I had signed for Ed Anderson.

He advised Ed has nothing to do with it and Prudential was to get paid out of
the
10% you told him you'd pay him (Charlie) on a sale.

I am not questioning the relationship between you and me at all .... I just want
you to
know what that addlebrained asshole is thinking, perhaps he needs in writing
that he is
NOT getting a 10% commission and must cooperate with me in such a sale.

Doug

8/27/2002

## The Tilley's

**From:**     "Doug Littlefield" <dougl@pshift.com>
**To:**       "The Tilley's" <cktilley@bellsouth.net>
**Sent:**     Monday, September 16, 2002 7:00 PM
**Subject:**  Misc. stuff

Hello Again:

Lots of activity today here are the highlights that need to be passed
along to you...

1) Vic Olsen called, he's one of the "Charlie" crowd of investors...though
actually seem slike a decent guy. He asked if he should go full tilt on the
people he had been getting interested or should he wait until after the
next public test....obviously I told him fire with both barrels !!! Why wait ?

2) Sherlock called me yesterday and gave me his son-in-laws name, address...turns
out this is the guy at Prudential. Charlie wanted a letter and explained the
parameters.
I have prepared one and will fax it to you if you'd like, in essence it says Prudential
can present the technologies to their clients and there is no cost of any kind
associated
with said presentations. I have stated that all communication related to this come
thru me
and I will confer with you and that, should a "deal" materialize it is understood by all
parties
that their compensation would come from the share Charlie gets as agreed with me.

Anyway, he said you have this guys fax number...if you want to consider it let me
know
and I'll fax you the letter I wrote (not that you have to use it of course...if you prefer
to
write your own)...

3) I had a long conversation with Conrad von Colpitts ... he is the party with the wind
system
and some other things.....you'd like him...Marine counter intelligence guy (retired).
We discussed
the potential for your "stuff" boosting the benefit of his "stuff" and in one particular
instance there
may well be some synergy. To that end he will soon send you a product of his, a
free standing
lighting system upon which to apply a device like the building unit...when you have
time...he will

9/16/2002

also send a few pictures of one of his control devices that was returned because "it didn't work".

Conrad advises he installs thermal bobby traps and the people that sent it back must have tried
to open it because it's fried !!! He sounds like my kind of guy.

Just thought I'd give you a heads up on the shipment, I can fill in some more details after you get
it.

4) I expect a written offer sometime this week from the group I met with last Friday ....

I guess that covers the miscellaneous...

Doug

9/16/2002

## The Tilley's

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Monday, November 18, 2002 5:53 PM |
| **Subject:** | Boeing |

Hi Carl:

I sent you a copy of an email I sent to Herr Schneider, it was in response to a letter enclosed in a brochure he mailed me.

Also, I spoke with the fellow at the Boeing Phantom Works this afternoon, he is interested in paying you a visit to see the "stuff" on Monday December 3rd...does that work for you ?

Doug

11/18/2002

## The Tilley's

**From:** "Doug Littlefield" <dougl@pshift.com>
**To:** <adolf.schneider@tiscali.ch>
**Cc:** "The Tilley's" <cktilley@bellsouth.net>
**Sent:** Monday, November 18, 2002 5:50 PM
**Subject:** Re: Tilley Investments

Good Day:

I received your package via post today, thank you.

Am I to understand you saw enough of the stationary power unit to
wire the Foundation the 10 Million Dollar deposit to take it off the
market ?

As for providing the account information ,at this time I suggest we wait
until you have secured the money and are ready to actually send the wire.
As you might assume, we are not in the habit of giving out our banking
information until it is absolutely necessary.

I don't know what your timing is, however, just to keep you informed
we are in serious discussions with two (2) other parties that advise they
are quite close to making a final decision. Consequently, time may well be
of the essence.

I again thank you for your dedicated interest and look forward to your
next note.


Most Sincerely,


Douglas C. Littlefield
Director - Tilley Foundation inc.

11/18/2002

## The Tilley's

| | |
|---|---|
| **From:** | \<adolf.schneider@tiscali.ch\> |
| **To:** | \<dougl@pshift.com\> |
| **Cc:** | \<cktilley@bellsouth.net\> |
| **Sent:** | Tuesday, November 19, 2002 3:40 PM |
| **Subject:** | Investments |

Dear Mr. Tilley

Thanks for your last two emails where you requested that interested investors should deposit 10 Mio. USD into your account in order to take Tilley's stationary invention off the market.

We are in continous contact with two resp. three investors. One of them - a multibilliardair - is the owner of the biggest distribution market in Europe and the second biggest in US. He wrote us the he would agree to sell such energy systems in his companies (he owns several hundreds) but for the moment he prefers to buy such systems from a external producer. We think that we can convince him to buy such a technology himself and to choose a suitable producer. Originally we hoped that you could come to Europe and to negociate yourself with him. But as you may understand it is in this special case not possible to convince him to deposit first 10 Mio USD to an US account without further data and prove that the product works really as it should.

Therefore we like to collect more data concerning the performance of the system and we will send you a list with some technical questions in the next days. This questions have nothing to do with the energy generation or transformation inside the box but only with the external performance (load situations etc.).

With best wishes
Sincerely
Adolf & Inge Schneider
TransAltec Inc.

11/19/2002

## The Tilley's

**From:** "Doug Littlefield" <dougl@pshift.com>
**To:** "The Tilley's" <cktilley@bellsouth.net>
**Sent:** Friday, November 22, 2002 10:04 AM
**Subject:** Re: M

Hello Again:

Just back...now scheduled for a biopsy on 12/12 .....

On a positive note, I received communications today that someone I have been working with is preparing to visit the first week of December with the "stated" commitment that if they like what they see of the stationary unit a deposit of 10M will be wired THEN with the additional 90M timing as we will negotiate during that visit !! Of course talk is cheap....but we'll see !!

I also have someone that will meet me in Lebanon and come out and hook up the Power Tracer at no cost to us... will combine that with very next trip.

See ya !!

Doug

|

11/22/2002

## Carl Tilley

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | <k.jebens@jebens-gruppe.de> |
| **Cc:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Tuesday, December 24, 2002 7:23 PM |
| **Subject:** | Tilley |

Dear Herr Jebens:

Carl Tilley forwarded your fax to me as I am charged with handling the business aspects of the Foundation as regards the sale of the various technologies.

It is quite interesting that your Family had involvements with the parties mentioned, I find history to be a fascinating subject.

With respect to your potential interest in the Tilley Foundation technologies I should note that Herr Schneider may not have fully conveyed the asking prices and terms we are discussing with other prospective buyers. Consequently, to be sure we all use the same information, I would like to relate below the specifics attributable to each of the technologies.

Following is copied from my message to Herr Schneider on 12/20/02:

The prices for the various technologies are:

| | | |
|---|---|---|
| 1) Golf Cart / ATV / motorboat | $ | 14 Million |
| 2) Stationary Power (building) | $ | 100 Million |
| 3) Automobile | $ | 7 Billion |
| 4) Airplane | $ | 8 Billion |
| 5) Small portable generator (new) | $ | 8 Million |

Everything in one bundle      $ 15 Billion

With respect to your notation regarding a "lump sum", it is our position that to take any (or all) of the technologies off the market will take a non-refundable down payment. The exact amount would be determined by which particular technologies are to be purchased, on the smaller amounts ( 8 Million to 100 Million) we are asking for a 10% deposit. As for the two larger ones we would consider a down payment for either, or both, of 250 Million to be adequate.

After the down payment we would anticipate agreeing upon a schedule of payments, perhaps tied to requirements the buyer may place regarding

12/24/2002

Case 2:06-cv-00061   Document 10   Filed 07/30/06   Page 21 of 48 PageID #: 84

certain milestones they wish to reach. However, before we enable said buyer to reproduce any (or all) of the technologies we will require the "then remaining" outstanding balance to be placed in escrow for immediate release to the Foundation immediately upon the buyers ability to duplicate our devices.

Naturally, we are most willing to consider any qualified buyers proposal that is received in writing.

As you can see from the return address I can be reached via dougl@pshift.com or you can fax me at 775-242-0655.

On behalf of the Foundation, I thank you for your interest and I look forward to the prospect of establishing an active dialogue pertaining to our sale of the technologies.

May you and your Family have a Joyous Holiday Season and also a Happy, Healthy & Prosperous New Year !

Most Sincerely,

Douglas C. Littlefield
Director- Tilley Foundation Inc.

12/24/2002

**Carl Tilley**

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Tuesday, December 24, 2002 7:01 PM |
| **Subject:** | 1,000 milion |

Hi Carl:

I LIKE the Trojan letter.....

As for the math, as soon as i hung up I realized it was 1 Billion...not 10 Billion.

However, 1 Billion deserves an answer ... although it's hard to be certain what this party means....his use of the word "financing" is likely a transcription from German into English wherein he means "price" ( especially in light of the next comment regarding a lump sum...)

I will fax him a message detailing the actual asking prices for the various segments and see where it goes.

Doug L.

12/24/2002

## Carl Tilley

**From:** "Doug Littlefield" <dougl@pshift.com>
**To:** "The Tilley's" <cktilley@bellsouth.net>
**Sent:** Wednesday, January 29, 2003 1:06 PM
**Subject:** Philly



To save time let's just assume I know everything!

# CARL:

OK, I was just told that the draft is going back and forth to the American Indian guy in Florida, the lawyers in Philly and the 'Philly" people. It is believed that it will be faxed to me today.

I was also advised that the only glitch may be that one of the "approving" parties is headed on a plane to the west coast in 2 hours...however, he

1/29/2003

Case 2:06-cv-00061   Document 10   Filed 07/30/06   Page 24 of 48 PageID #: 87

personally promised if it isn't faxed to me before he leaves they will fax it to his hotel and he will forward it to me (after his final review) as soon as he arrives....which could mean it would come in to my e-mail overnight and I would have it in the morning.

I told him in no uncertain, but polite, terms that "tomorrow, tomorrow, tomorrow" is at this point worn out ! I was given a promise it is real and will move forward...

Nothing much more I can do but wait, worry and pray !!!!!

Doug


click here!

IncrediCreations

Font is ZiptyDo
Download here

1/29/2003

**Carl Tilley**

| | |
|---|---|
| **From:** | "Doug Littlefield" <dougl@pshift.com> |
| **To:** | "The Tilley's" <cktilley@bellsouth.net> |
| **Sent:** | Thursday, January 30, 2003 4:38 PM |
| **Subject:** | contract |

  

Hi Carl:

OK, just received the offered contract and will print it out and fax you a copy....haven't read it yet. Let's both look it over and then go back and forth with any changes that you may feel are necessary. I will handle any of that directly with Chris and Bill Alston via fax and e-mail.

Chris advises he will be in Philly next Wed & Thurs so if there is any need to do so I will go down there....like I said a few days ago now that it is at this point I will take control and I am sure I can get Bob to front me expense money.

Anyway, look it over and let's go for it !!



Doug

1/30/2003

Case 2:06-cv-00061   Document 10   Filed 07/30/06   Page 26 of 48 PageID #: 89

## Carl Tilley

**From:**    "Doug Littlefield" <dougl@pshift.com>
**To:**      "Tinker & Associés" <michaelp.tinker@qc.aira.com>
**Cc:**      <cktilley@bellsouth.net>
**Sent:**    Sunday, March 02, 2003 1:47 PM
**Subject:**  Re: Damage Control - Bombardier

**Hi Mike:**

As I said when I called Friday, we did not specifically notify you as there have been many critical comments on the Internet since as early as last July. More than one has accused Carl of perpetrating a fraud and, frankly, given that the Bombardier people's earlier visit precipitated a more extensive testing date we thought they would easily be able to identify the lack of validity in the claim that the technology doesn't work at all.

I believe a quote from the fellow named "Kibbey", who claims to be the true inventor, is that "it wouldn't light a 200 watt light bulb for four hours"......as known to be wrong by the fellows that visited from Bombardier since they were at the facility and saw a great deal more than that with their own eyes.

In fact, Carl and this Kibbey fellow were partners in another project. It too dealt with sustaining electrical generation, however, it used a different technology...which (in this Kibbey is correct) did not work.

He and Mr. Webb have presented different information each time they have vocalized their accusations. Their story has not been at all consistent. In fact I find it rather amusing that Webb claims he is a "whistleblower" to save the public from a scam...but has instituted a lawsuit against Carl for 10% of the stock. Interesting he would sue for 10% of nothing isn't it ?

As stated on Friday, I have copies of the legal documents on both sides of the issue and would be glad to bring them to a meeting in which I am completely confident the matter would be cleared up to the satisfaction of Bombardier. Of course we understand their concerns.

3/2/2003

Regarding the statement that some "scam" was going to be exposed in Wyoming...if one reads the follow up information the web site creator (Sterling Alan) was taken to task by the reporter herself as he was editorializing her information. They "turned up" the fact that Carl went bankrupt in a business up there and there were a couple of people that didn't like him as a result. Not something I, or anyone else I've spoken to, find to be of any consequence in this matter.

As mentioned above, this is NOT...I repeat NOT the technology that Carl and Kibbey collaborated on...in fact in the TV interview Kibbey said "it was Carl's idea" anyway !

Mr. Webb sold stock for Carl on a commission basis and was paid by the hour for odd jobs. He was never an "investor". His argument and public condemnation of Carl started when, at a Board of Directors meeting, he demanded 10% of the Foundation, a 250K a year salary and a secretarial job for his wife at 150K a year. When he was turned down, then and only then, did he launch an effort to (as I can quote him saying) "destroy Carl". As a business consultant Mike I think you too find this outrageous !

Mike, I can give you significant detail about the background and activities of both Kibbey and Webb but choose not to enter their gutter and write you about all the details. I will, however, be glad to make this information known in a joint meeting so their motivation of "getting in on the action...or destroying it" is eminently clear.

Among the leal documents I have in my possession is a copy of a Judge's order for both of these people to cease and desist from making their allegations. This order is dated the last week in January and, as you know, they paid no attention to it. There is currently a motion before the Court to jail them for contempt along with other remedies of law.

Webb is not a bright man, though he thinks he is. He is under the delusion that as a (as he calls himself) "whistleblower" he is immune from prosecution for contempt of Court and the other things he has been doing. Of course this is his opinion and not that of any bona fide

3/2/2003

legal counsel …. he is going to find he is quite wrong.

Imagine, it's a fraud, it doesn't work, etc., etc. and yet he has an active legal action to claim his 10% of the Foundation and the previously mentioned salaries. He also illegally filed a lien against Carl's personal property with respect to his demands for money.

As American's one of our biggest problems is too much freedom, the ability to attempt to destroy a person or business at will is one of the "worst" things our system includes. These two are deceitful opportunists
of the worst sort and I would truly appreciate the opportunity to meet with the folks at Bombardier and discuss this matter face to face.

Mike, I could go one for many, many pages….but I suspect you get the drift. As Bombardier has that preliminary document to protect themselves from getting trapped in a situation where false claims are made simply to elicit money from them in a "settlement", so too are we the victims of this kind of activity with the added "twist" of a "give in or be destroyed" mentality.

I trust you will make every effort to arrange a meeting so we can put this behind us and I can assure you we will neither give in…OR be destroyed by the likes of Kibbey & Webb !


Sincerely,

Doug Littlefield




3/2/2003

**EXHIBIT 3**



**Business Name**,
Business ID Number, Type, Status

**TILLEY FOUNDATION, INC.**
0412492 , CORPORATION , ACTIVE

**1 record(s) have been found**

Note: This information is current as of three working days prior to today's date.

Search Again

Report a Technical Issue

Case 2:06-cv-00061   Document 10   Filed 07/30/06   Page 31 of 48 PageID #: 94



**EXHIBIT 4**

# CORPORATE RESOLUTION OF TILLEY FOUNDATION, INC.

WHEREAS, Tilley Foundation, Inc., (hereinafter referred to as the "Company") has been served with a lawsuit styled ***Doug Littlefield, Robert Molleur and Rodney Barrup v. Carl Benson Tilley, Katherine Tilley, Tilley Foundation, Inc., (a Tennessee corporation) and CT Technology, Inc. (a Nevada corporation)***, United States District Court for the Middle District of Tennessee Case No. 2:06-0061; and

WHEREAS, the Company is aware of the allegations made against Carl Tilley and his wife, Katherine "Kitty" Tilley; and

WHEREAS, the Company is aware of the potential conflicts of interest if Mr. Fincher should represent both Tilley Foundation, Inc., and Carl Tilley and Katherine Tilley, as explained in the attached ACKNOWLEDGMENT OF POTENTIAL EXISTENCE OF CONFLICT OF INTEREST AND WAIVER OF POTENTIAL CONFLICT OF INTEREST, but the Company, after due consideration by the full Board of Directors, does not believe that the Company's interests and those of Mr. and Mrs. Tilley are in conflict nor are they likely to come into conflict, and the Company desires for Mr. Fincher to represent the Company and Mr. and Mrs. Tilley in this matter;

THEREFORE, BE IT HEREBY RESOLVED that the Company shall enter into and sign the attached ACKNOWLEDGMENT OF POTENTIAL EXISTENCE OF CONFLICT OF INTEREST AND WAIVER OF POTENTIAL CONFLICT OF INTEREST and shall employ Mr. Fincher as counsel for it in this matter.

So APPROVED this the 1 day of July, 2006.

_____      _____
CARL TILLEY                                    KATHERINE TILLEY

_____      _____
BEN HOGANCAMP                             JOE BOLEN

_____      _____
CECIL BOSWELL                               T.J. DUPREE

## SECRETARY'S CERTIFICATE OF ADOPTION

I hereby certify that the foregoing corporate resolution was considered and adopted at a properly called special meeting of the Tilley Foundation, Inc., Board of Directors, that a quorum was present, and that said resolutions was approved by a majority of said directors at said meeting.

KATHERINE TILLEY, Corp. Secretary

# AFFIDAVIT OF KATHERINE TILLEY

STATE OF TENNESSEE )
COUNTY OF SMITH )

1. I am over the age of eighteen (18) years and have personal knowledge of the facts stated herein.

2. My Husband, Carl Tilley, and I are senior citizens who live in rural Smith County at 131 Hiwassee Road, Lebanon Tennessee. I am Secretary of the Tilley Foundation, Inc., a Tennessee corporation.

3. Carl has invented technology that produces superior results and performance in electric motors. This technology has been the subject of controversy since its existence became known. The technology has been tested and proven a number of times in private testing. The technology has been offered for sale for years but due to various lawsuits and investigations has not been sold yet. The technology has been protected by "trade secret" methods (i.e., kept under wraps) and not by a patent. This decision was known and approved by the board of the Tilley Foundation. Inc., and has been known to the shareholders since I made this decision in 2002. We chose to rely upon trade secret protection or so due to the difficulty of defending patent lawsuits. Mr. Littlefield knew or should have known since at least August 2002 that no patent was contemplated or desired by me. Mr. Moeller and Mr. Barrup knew or should have known by May 2003 that no patent was contemplated or desired by me or the Board of the Tilley Foundation, Inc.

4. In late 2002, fraud allegations were raised against Carl and the Tilley Foundation, Inc. Two (2) of Carl's former associates – Robert Kibbey and Walter Webb – filed suit in state court claiming that my technology did not work and that Carl had engaged in securities fraud. They even went on television with their claims in February 2003, appearing on WSMV Channel 4 - in express violation of a state court order prohibiting such appearances - and repeating their false claims. Both Mr. Kibbey and Mr. Webb later completely repudiated these claims and signed affidavits renouncing their claims. Mr. Littlefield, Mr. Moelleur and Mr. Barrup were aware of these allegations at the time they arose in late 2002.

5. Based on the initial allegations of Webb and Kibbey, the State of Tennessee, Division of Securities began an investigation into Carl, the technology, and the Tilley Foundation, Inc. Through his attorney, Carl offered to cooperate with the investigation and to provide the technology for testing. However, the State elected to obtain a search warrant in secret and to seize all documents and technology from us and the Tilley Foundation, Inc. The search was performed in May 2003 by the Tennessee Bureau of Investigation. The TBI took the technology and all documentation related to

the Tilley Foundation, Inc., and took all of our records. Although ordered to return everything they took, the TBI did not return everything they took.

6.    For two (2) years the State of Tennessee reviewed the documents and the technology. In 2004, the Tilley Foundation, Inc., and Carl – with the full knowledge of the Plaintiffs - sued the State of Tennessee for failing to file charges and for return of the unlawfully seized property. In response to this lawsuit, the State of Tennessee indicted Carl on charges of theft, securities fraud and sale of unregistered securities – a paperwork violation. In 2005, the State of Tennessee dismissed the theft and fraud charges and returned all property and documentation to me. Carl had never disputed the technical problem of selling stock without the benefit of counsel who was familiar with Tennessee's "Blue Sky" laws. Carl agreed to take judicial diversion only on the charge of selling unregistered securities because Carl has not committed any fraud. I have never been charged with a crime or convicted of any crime. Judicial diversion is a Tennessee statutory procedure whereby a person charged with a crime pleads guilty to the offense, but if he satisfactorily completes a period of probation, the charges are expunged from his record. Thus, the State of Tennessee, after seizing all the technology and records of the Tilley Foundation, Inc. – the most invasive "discovery" imaginable - could not prove a case of securities fraud or theft, and settled for judicial diversion on a paperwork charge. No civil charges have ever been filed, instituted or processed by the State of Tennessee Division of Securities against me, my husband or the Tilley Foundation, Inc. Mr. Littlefield, Mr. Molleur, and Mr. Barrup knew or should have known all of these details at or near the time they happened.

7.    From 2002 until 2004, Mr. Littlefield, Mr. Molleur, and Mr. Barrup were active in the marketing of the technology and in the purchase and sale of stock in the Tilley Foundation, Inc. Plaintiff Doug Littlefield served as "broker" for the technology and claimed to have several significant buyers for the technology in the amounts of billions of dollars. Plaintiff Bob Moeller and Plaintiff Doug Littlefield were aware of the actions by the Tennessee Bureau of Investigation in May 2003. Mr. Moeller and Mr. Littlefield arranged for Carl to relocate temporarily to the State of Vermont to work on a prototype device and participated actively in helping Carl modify an electric car using the technology.

8.    The Tilley Foundation, Inc., has a Board of Directors currently consisting of Carl and I, Ben Hogancamp, Joe Bolen, Esq., T.J. Dupree and Cecil Boswell. Thus, a majority of the Board of Directors are not related to or affiliated with Carl or me. Many of the shareholders of the Tilley Foundation, Inc., are residents of the State of Tennessee. The company holds annual shareholders' meetings, and recently held one at the company facility at 131 Hiwassee Road. The Tilley Foundation, Inc., is listed as an active corporation with the State of Tennessee Secretary of State and is current in all tax filings. See **Exhibit 1** attached to this Affidavit and incorporated as if fully set forth herein. The Board of the Tilley Foundation, Inc., has considered the allegations of made by the Mr. Littlefield, Mr. Molleur, and Mr. Barrup in this suit and has voted to employ joint counsel because it determined the charges lack merit. See **Exhibit 2** attached to this Affidavit and incorporated as if fully set forth herein.

9.    The last time Carl sold any stock in the Tilley Foundation, Inc., is 2003. Carl is under a court order to not sell any unregistered securities as part of his diversion, and he has not and will not violate this requirement. I have no plans or desire to sell any securities and will not unless they are properly registered or exempt.

10.    Carl and I have no financial resources other than our Social Security payments and the real estate located at 131 Hiwassee Road, Lebanon Tennessee.

11.    The Tilley Foundation, Inc., has no liquid funds either, having used those funds to build improvements at 131 Hiwassee Road and on research and development expenses associated with the technology at issue in this case. The funds raised from the sale of our personal stock went into developing the prototypes, expenses for research and development, and construction of facilities for the operation of the Tilley Foundation, Inc. Thus, the only asset that Carl, I or the Tilley Foundation, Inc., own related to the operation of the company is the real estate located at 131 Hiwassee Road, Lebanon TN that Carl and I own and the Tilley Foundation rents.

12.    No sale of the real property located on Hiwassee Road has been attempted nor is any contemplated. The property is not listed with a real estate agent and no contracts for sale have been solicited or received.

13.    The technology works as advertised. In my opinion, the technology does work; that the technology will permit an electric car to run for hundreds of miles without having to recharge; that the technology has been tested by private entities and demonstrated to work as claimed; and that the technology will save fossil fuels and cut national energy consumption if mass produced.

14.    The only bank accounts on which I have signatory authority are for the accounts into which our Social Security payments are deposited.

15.    The real property at 131 Hiwassee Road has an appraised value of $191,100.

16.    Defending the dissolution suit will cost the Tilley Foundation, Inc., an estimated one hundred fifty thousand dollars ($ 150,000.00). Fifty thousand dollars ($50,000.00) will pay for 250 hours of legal work at our attorney's normal and customary rate of $200 an hour. Hiring experts to become familiar with the case, participate in discovery and testify will cost an additional fifty thousand dollars ($ 50,000.00). It will take hundreds of hours of my time and at least 100 hours of the Board's time to handle the many different problems caused by this dissolution suit, all of which we value at fifty thousand dollars ($ 50,000.00).

FURTHER AFFIANT SAITH NAUGHT.

_____
KATHERINE TILLEY

Sworn to and subscribed to before me
This the 26th day of July, 2006.

_____
NOTARY PUBLIC

My Commission expires 2/26/2009

**EXHIBIT 1**



Secretary of State Web Site | Instructions

**Business Name**,
Business ID Number, Type, Status

**TILLEY FOUNDATION, INC.**
0412492 , CORPORATION , ACTIVE

**1 record(s) have been found**

Note: This information is current as of three working days prior to today's date.

Search Again

Report a Technical Issue

Case 2:06-cv-00061   Document 10   Filed 07/30/06   Page 40 of 48 PageID #: 103

**EXHIBIT 2**

## CORPORATE RESOLUTION OF TILLEY FOUNDATION, INC.

WHEREAS, Tilley Foundation, Inc., (hereinafter referred to as the "Company") has been served with a lawsuit styled ***Doug Littlefield, Robert Molleur and Rodney Barrup v. Carl Benson Tilley, Katherine Tilley, Tilley Foundation, Inc., (a Tennessee corporation) and CT Technology, Inc. (a Nevada corporation)***, United States District Court for the Middle District of Tennessee Case No. 2:06-0061; and

WHEREAS, the Company is aware of the allegations made against Carl Tilley and his wife, Katherine "Kitty" Tilley; and

WHEREAS, the Company is aware of the potential conflicts of interest if Mr. Fincher should represent both Tilley Foundation, Inc., and Carl Tilley and Katherine Tilley, as explained in the attached ACKNOWLEDGMENT OF POTENTIAL EXISTENCE OF CONFLICT OF INTEREST AND WAIVER OF POTENTIAL CONFLICT OF INTEREST, but the Company, after due consideration by the full Board of Directors, does not believe that the Company's interests and those of Mr. and Mrs. Tilley are in conflict nor are they likely to come into conflict, and the Company desires for Mr. Fincher to represent the Company and Mr. and Mrs. Tilley in this matter;

THEREFORE, BE IT HEREBY RESOLVED that the Company shall enter into and sign the attached ACKNOWLEDGMENT OF POTENTIAL EXISTENCE OF CONFLICT OF INTEREST AND WAIVER OF POTENTIAL CONFLICT OF INTEREST and shall employ Mr. Fincher as counsel for it in this matter.

So APPROVED this the 1 day of July, 2006.

| | |
|---|---|
| CARL TILLEY | KATHERINE TILLEY |
| BEN HOGANCAMP | JOE BOLEN |
| CECIL BOSWELL | T.J. DUPREE |

## SECRETARY'S CERTIFICATE OF ADOPTION

I hereby certify that the foregoing corporate resolution was considered and adopted at a properly called special meeting of the Tilley Foundation, Inc., Board of Directors, that a quorum was present, and that said resolutions was approved by a majority of said directors at said meeting.

_Katherine Tilley_
KATHERINE TILLEY, Corp. Secretary

LEXSEE 2006 US DIST LEXIS 28076

## MARILYN HOLLOMAN v. METROPOLITAN GOVERNMENT OF NASHVILLE/DAVIDSON COUNTY, et al.

### NO. 3:05-0609

### UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

### *2006 U.S. Dist. LEXIS 28076*

### May 4, 2006, Filed

**COUNSEL:** [*1] For Marilyn Holloman, Plaintiff: Joseph Howell Johnston, Nashville, TN; Robert Belton, Vanderbilt Legal Clinic, Vanderbilt School of Law, Nashville, TN

For Metropolitan Government of Nashville and Davidson County, Defendant: Francis Howard Young, Metropolitan Legal Department, Nashville, TN

For Dr. Pedro Garcia, Individually, Defendant: L. Webb Campbell, II, Sherrard & Roe, Nashville, TN; Scott Hickman, Sherrard & Roe, Nashville, TN

For Chris Henson, Individually, Defendant: Stanley E. Graham, Waller, Lansden, Dortch & Davis, Nashville, TN; Waverly David Crenshaw, Jr., Waller, Lansden, Dortch & Davis, Nashville, TN

**JUDGES:** TODD J. CAMPBELL, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** TODD J. CAMPBELL

**OPINION:**

MEMORANDUM

Pending before the Court is Plaintiff's Motion for a Preliminary Injunction (Docket No. 28). For the reasons stated herein, Plaintiff's Motion is DENIED.

FACTS

Plaintiff, an African-American female, was employed by Defendant Metropolitan Government of Nashville/Davidson County ("Metro") as Director of Food Services for the Metro School System for more than ten years, until Metro terminated her assignment to that position in May of 2003. On August 5, 2005, Plaintiff sued [*2] Defendants in this action for race and gender discrimination in violation of Title VII and *42 U.S.C. §*

*1981.* Plaintiff seeks, among other things, reinstatement to the position of Director of Food Services.

Plaintiff asks the Court to issue a preliminary injunction requiring Metro to notify, in writing, the current Director of Food Services (and any individual Defendants select for that position during the pendency of this action) that this action is pending and the Court has the authority to displace him or her from that position should it decide Plaintiff is entitled to reinstatement as Director of Food Services.

INJUNCTIVE RELIEF

In determining whether to issue a preliminary injunction pursuant to *Rule 65 of the Federal Rules of Civil Procedure,* the Court is to consider: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to others; and (4) whether the public interest is advanced by the injunction. *Michigan State AFL-CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997). [*3]

Plaintiff contends that she needs this preliminary injunctive relief because (1) the Director of Food Services is a unique position, (2) to prevent Defendants from taking steps to bestow "innocent victim" status upon any person now serving in or who hereafter may be appointed to the position, and (3) to preserve the authority of the Court to award Plaintiff reinstatement if she is successful on the merits of this action.

The Court finds that Plaintiff has not shown the imminent, irreparable harm required for a preliminary injunction. The person currently in the Director of Food Services position has been in that position since June of 2003, almost three years. This action has been filed for nine months. Metro has represented that Jay Nelson, the current Director of Food Services, is very aware of the

existence of this litigation. If Plaintiff has concerns, there is nothing preventing Plaintiff from notifying Mr. Nelson herself of the existence of this litigation and the fact that she is seeking reinstatement. There will be no imminent, irreparable harm if the requested injunction does not issue. Having found no imminent, irreparable harm, the Court need not address the remaining [*4] three factors for injunctive relief.

CONCLUSION

Accordingly, Plaintiff's Motion for Preliminary Injunction (Docket No. 28) is DENIED.

IT IS SO ORDERED.

TODD J. CAMPBELL

UNITED STATES DISTRICT JUDGE

LEXSEE 2006 U.S. DIST. LEXIS 44874

**D.B., a minor, by and through his parent and guardian, SHARON BROGDON, R.W. and C.W., both minors, by and through their parent and guardian ROGER WHITE, Plaintiffs, v. STEVE LAFON, in his individual and official capacity; ALVIN HORD, in his official capacity, and BLOUNT COUNTY SCHOOL BOARD, Defendants.**

No.: 3:06-CV-75 (VARLAN/SHIRLEY)

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

*2006 U.S. Dist. LEXIS 44874*

**June 30, 2006, Decided**

**COUNSEL:** [*1] For Sharon Brogdon, next friend D.B., Roger White, next friend R.W., next friend C.W., Plaintiff: Kirk D Lyons, Southern Legal Resource Center, Inc., Black Mountain, NC. Van Irion, Law Office of Van Irion, Knoxville, TN.

For Steve Lafon, Individually, Defendant: Gary M Prince, O'Neil, Parker & Williamson, Knoxville, TN.

For Steve Lafon, In his official capacity as Principal of William Blount High School, Alvin Hord, In his official capacity as Director of Schools, Blount County School Board, Defendant: LaJuana G Atkins, Crawford, Crawford & Newton, Maryville, TN. Norman H Newton, Jr, Crawford, Crawford & Newton, Maryville, TN. Robert N Goddard, Goddard & Gamble, Maryville, TN.

For Blount County School Board, Defendant: Norman H Newton, Jr, Crawford, Crawford & Newton, Maryville, TN. Robert N Goddard, Goddard & Gamble, Maryville, TN.

**JUDGES:** Thomas A. Varlan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Thomas A. Varlan

**OPINION:**

### MEMORANDUM OPINION

Plaintiffs, three students at William Blount High School in Blount County, Tennessee, allege defendants, Blount County school officials, are violating plaintiffs' *First* and *Fourteenth Amendment* rights by prohibiting them from wearing [*2] clothing depicting the confederate battle flag.

This civil action is now before the Court for consideration of plaintiffs' motion for preliminary injunction and temporary restraining order [Doc. 3]. Plaintiffs seek an order enjoining defendants "to cease interfering with plaintiffs' and other students' constitutionally[-]protected right to express themselves through attire that reflects their political beliefs." Doc. 3 at 4. Plaintiffs argue, *inter alia,* that a preliminary injunction is appropriate because there is a substantial likelihood that plaintiffs will prevail on the merits. *See id.* at 8-9. Specifically, plaintiffs argue that the ban is unjustified because defendants have failed to identify any disruption at the high school caused by depictions of the flag; and even if such disruptions may be shown, defendants are engaging in viewpoint discrimination because they have banned depictions of the confederate battle flag but not certain other political symbols, such as Malcolm X symbols and foreign national flags. *See id.*

Defendants respond in opposition to the motion by pointing to two facts. First, defendants state that during the 2004-05 school year, William [*3] Blount High School experienced a number of racially motivated incidents directed against African American students, including fighting and threats, that resulted in a school lockdown involving law enforcement, as well as complaints of racial harassment to the board of education and federal officials. *See* Doc. 7-3. Second, defendants state that there have been 452 dress code violations, 23 of which involved the confederate battle flag, but there have been no reports of violations involving "Malcolm X words ... or international flags." *See* Doc. 7-2 at 2.

The issues have been briefed thoroughly by both sides, and the Court heard oral argument on May 4, 2006. Thus, the motion now is ripe for disposition. For

made to the board of education. Based upon those events, defendant Hord concluded that "the wearing of the 'Confederate flag' by students during school hours has a significant disruptive effect on the proper education environment of the students at the Blount County high school." *Id.* at 3.

## II. Discussion [*8]

### A. Standard for Relief

A party seeking a temporary restraining or preliminary injunction order bears the burden n2 of establishing four factors, which the Court must balance: (1) irreparable harm to movant if such an order is not entered; (2) likelihood of harm to others if such an order is entered; (3) movant's substantial likelihood of success on the merits; and (4) the impact on the public interest by entry of such an order. *See Nightclubs, Inc. v. City of Paducha, 202 F.3d 884, 887 (6th Cir. 2000); Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998)* (citing *Golden v. Kelsey-Hayes Co., 73 F.3d 648, 653 (6th Cir 1996), cert. denied, 519 U.S. 807, 117 S. Ct. 49, 136 L. Ed. 2d 13 (1996))*.

> n2 Plaintiffs contend that defendants bear the burden of disproving plaintiffs' allegations of a constitutional violation, and defendants' failure to satisfy that burden results in plaintiffs' satisfaction of their burden to show a substantial likelihood of success on the merits. *See Doc. 15 at 9* (citing *Castorina v. Madison County Sch. Bd., 246 F.3d 536, 543-44 (6th Cir. 2001))*. *Castorina*, however, did not so state. Instead, plaintiff bears the burden of establishing the need for a preliminary injunction. *See Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998)*. A plaintiff would satisfy that burden, in part, by showing a substantial likelihood of success on the merits. *See id.* A plaintiff establishes that he or she has a substantial likelihood of success on the merits by showing that the policy in question is probably unconstitutional. *See id.* (citing *Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 460 (6th Cir. 1991))*.

[*9]

When a party seeks a preliminary injunction on the basis of a potential *First Amendment* violation, the likelihood of success on the merits factor is often determinative. *Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1998)*. With regard to the irreparable harm factor, courts have long recognized that "the loss of *First Amendment* freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)* (plurality), *quoted in Connection Distrib. Co., 154 F.3d at 288*. Therefore, to the extent a plaintiff can establish a substantial likelihood of success on the merits of the *First Amendment* claim, that plaintiff has also established the possibility of irreparable injury. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher, 70 F.3d 1474, 1490 (6th Cir. 1995), quoted in Connection Distrib. Co., 154 F.3d at 288*. The same is true with regard to the public interest factor, because the public interest always lies with protection of a party's constitutional rights. *See G & V Lounge, Inc v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994)*. [*10] *See also Fisher, 70 F.3d at 1490*. Furthermore, an examination of harm to the parties also requires a consideration of the merits, since the harm to a party resulting from imposition (or not) of an injunction is related to whether the conduct subject to the injunction is unconstitutional (or not). *See Connection Distrib. Co., 154 F.3d at 288*.

In this case, for the reasons just discussed, the likelihood of success on the merits factor is determinative, and consideration of that factor will be the focus of the remainder of this discussion. Accordingly, the crucial inquiry for the Court is whether the policy in question is likely to be found unconstitutional. *See Connection Distrib. Co., 154 F.3d at 288* (citing *Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 460 (6th Cir. 1991))*.

### B. Constitutionality of Confederate Battle Flag Prohibition

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)*. Equally important, however, "the [Supreme] Court has repeatedly [*11] emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id. at 507*. Thus, school officials may not punish "silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id. at 508*.

School officials may ban racially divisive symbols when there has been actual racially motivated violence and when the policy is enforced without viewpoint discrimination. *See West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358 (10th Cir. 2000), discussed in Castorina v. Madison County Sch. Bd., 246 F.3d 536, 543-44 (6th Cir. 2001)*. On the other hand, even if there has been racial violence that justifies a ban on racially divisive symbols, school officials may not enforce "a viewpoint-

school's policy probably imposes "a viewpoint-specific ban on [some] racially divisive symbols and not others." *See Castorina v. Madison County Sch. Bd., 246 F.3d 536, 544 (6th Cir. 2001).*

### III. Conclusion

In summary, for the reasons discussed herein, plaintiffs have not presented evidence sufficient to establish a substantial likelihood of success on [*22] the merits. Accordingly, the motion for a preliminary injunction will be denied.

ORDER ACCORDINGLY.

Thomas A. Varlan

UNITED STATES DISTRICT JUDGE

### ORDER

This civil action is now before the Court for consideration of plaintiffs' motion for preliminary injunction and temporary restraining order [Doc. 3]. For the reasons discussed in the memorandum opinion entered contemporaneously herewith, plaintiffs have failed to establish a substantial likelihood of success on the merits. Therefore, the Court hereby **DENIES** the motion for a preliminary injunction and temporary restraining order [Doc. 3].

IT IS SO ORDERED.

Thomas A. Varlan

UNITED STATES DISTRICT JUDGE