



SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee.
Annie E. Hyde JOHNSON et al.
v.
JOHN HANCOCK FUNDS et al.
**No. M2005-00356-COA-R3-CV.**

Dec. 13, 2005 Session.
June 30, 2006.

Appeal from the Chancery Court for Davidson County, No.03-909-III; Ellen Hobbs Lyle, Chancellor.

H. Naill Falls, Jr., Nashville, Tennessee, for the appellants, Annie E. Hyde Johnson, Linda D. Johnson, and Mary Anne Howland.
Hugh C. Howser, Jr. and Kevin C. Baltz, Nashville, Tennessee, for the appellee, Signator Investors, Inc.

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

**OPINION**

WILLIAM C. KOCH, JR., P.J., M.S.

***1** This appeal involves a dispute between a registered investment advisor and three of its clients regarding the investment advice the clients received from one of its agents. The clients filed suit against the advisor in the Chancery Court for Davidson County. The trial court dismissed the clients' Tennessee Consumer Protection Act claim for failure to state a claim upon which relief can be granted. After excluding the testimony of the clients' financial expert, the trial court also granted the advisor a summary judgment dismissing the investors' claims based on common-law fraud and misrepresentation, negligence, and breach of fiduciary duty. The investors have appealed. We have determined that the trial court erred by dismissing the investors' Tennessee Consumer Protection Act claims, by excluding the testimony of the plaintiffs' expert, and by granting a summary judgment dismissing the investors' remaining claims. Accordingly, we vacate the orders and remand the case for further proceedings.

**I.**

Marcus Henderson is a financial advisor who owns and operates the Henderson Financial Group in Nashville, Tennessee. He possesses the licenses and certification required to solicit orders for any type of security, to act as an investment advisor, and to sell life and health insurance, as well as mutual funds and annuities. Throughout his professional career, Mr. Henderson has been affiliated with Signator Investors, Inc., formerly known as John Hancock Distributors, Inc. (Signator Investors), a retail broker dealer and registered investment advisor of the John Hancock Financial Services network. Mr. Henderson sells various John Hancock products, including life insurance and securities through Signator Investors.

Signator Investors markets three classes of John Hancock mutual fund shares. Class A shares are front-loaded but do not require the payment of annual distribution fees. Class B shares are back-loaded and require the payment of an annual distribution fee. Class C shares are not front-loaded but may impose redemption fees. Determining which class of shares is appropriate for a particular investor requires careful consideration of the fees and expenses associated with each share class during the period of time the investor is planning to hold the investment, taking into account the possibility of redemption of the shares and the anticipated appreciation in the value of the shares. Generally, an investor seeking to purchase shares worth at least $100,000 will incur the fewest fees by purchasing Class A mutual fund shares.

The sale of Class B mutual fund shares has been the subject of regulatory and enforcement actions since at least 1988.[FN1] The Securities and Exchange Commission (SEC) has fined companies for selling Class B mutual funds in amounts in excess of $100,000 per transaction because these transactions subject the client to unnecessarily high fees.[FN2] Likewise, the National Association of Securities Dealers has established guidelines explicitly forbidding broker dealers such as Signator Investors from selling Class B mutual fund shares in excess of $100,000 per transaction and has also fined members for engaging in such transactions. Even Signator Investment's own internal policies state that a broker

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should not engage in selling Class B mutual fund shares in excess of $100,000 per transaction. Despite these regulatory actions, Mr. Henderson continued to sell his clients John Hancock Class B mutual fund shares in transactions in excess of $100,000.

FN1. *See, e.g., In Re: Flanagan,* Securities Act Release No. 7614, Exchange Act Release No. 40764, Investment Advisers Act Release No. 1776, 68 SEC Docket 2005 (Dec. 9, 1998), 1998 WL 847241.

FN2. *See, e.g., In Re: Morgan Stanley,* Securities Act Release No. 8339, Exchange Act Release No. 48789, 81 SEC Docket 1993 (Nov. 17, 2003), 2003 WL 22703073.

***2** In 1999, Mary Anne Howland, the owner of a small business in Nashville, sought Mr. Henderson's assistance to plan for her retirement and to pay for her son's college education. Mr. Henderson recommended that Ms. Howland purchase John Hancock Class B mutual fund shares and, eventually, assisted Ms. Howland in purchasing over $300,000 in Class B shares. Ms. Howland purchased $175,000 in Class B shares in a single transaction in 2002. Ms. Howland also followed Mr. Henderson's advice to purchase a variable annuity for her retirement. Ms. Howland acknowledged in writing that she had received prospectuses regarding these investments.

In April 2000, 76-year-old Annie Johnson also sought Mr. Henderson's investment advice. She owned a funeral home that was operated by her daughter, Linda Johnson, and had previously purchased life insurance from Mr. Henderson in 1996.[FN3] Annie Johnson had recently received $389,000 from the sale of her house and desired Mr. Henderson's assistance in investing these funds. The exact substance of the conversations among Mr. Henderson and the Johnsons is disputed. Annie Johnson and Linda Johnson insist that they informed Mr. Henderson that the funeral home did not generate much income for Annie Johnson. They also insist that they informed Mr. Henderson that they desired to use the proceeds from the sale of the home to ensure the payment of the expenses for Annie Johnson's care and assistance for the rest of her life. Accordingly, Annie Johnson did not desire to make risky investments and intended that any funds remaining at her death would be divided among her children.

FN3. Annie Johnson named Linda Johnson the beneficiary of this insurance policy. The purpose of the policy was to provide Linda Johnson with sufficient funds when Annie Johnson died to enable her to purchase her siblings' interests in the funeral home.

Mr. Henderson's version of his conversation with the Johnsons is vastly different. He insists that Annie Johnson told him that she desired to grow the proceeds as much as possible. He also insists that Annie Johnson told him that she did not need the money during her lifetime and that the funds would be used at her death to enable Linda Johnson to purchase her siblings' interests in the funeral home.

Mr. Henderson established a joint account for Annie Johnson and Linda Johnson and used all of the proceeds from the sale of Annie Johnson's home to purchase John Hancock Class B mutual fund shares. Like Ms. Howland before them, the Johnsons acknowledged in writing that Mr. Henderson had provided them with a prospectus regarding the investment. The value of the investment declined significantly during the next two years. By December 2002, less than $190,000 remained in the account. When Linda Johnson finally redeemed the account on March 11, 2003, its redemption value was $149,021.87.

In March 2003, Ms. Howland and the Johnsons filed suit in the Chancery Court for Davidson County against Mr. Henderson, Signator Investors, and three other related John Hancock companies. The complaint sought damages based on common-law fraud and misrepresentation, negligence, breach of fiduciary duty, and violation of the Tennessee Consumer Protection Act. Ms. Howland and the Johnsons asserted that the investments that Mr. Henderson purchased on their behalf were excessively risky in light of their stated investment goals and that the purchase of the Class B mutual fund shares resulted in their payment of fees higher than those they would have paid had they purchased Class A mutual fund shares. Ms. Howland also alleged that the annuity Mr. Henderson recommended was unsuitable for her needs.

***3** Ms. Howland and the Johnsons eventually voluntarily dismissed their claims against the three John Hancock defendants. On September 2, 2004, the trial court dismissed their Tennessee Consumer Protection Act claims regarding the sale of the Class B mutual fund shares but declined to dismiss Ms. Howland's Tennessee Consumer Protection Act claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regarding the sale of the annuity.[FN4] One week later, on September 9, 2004, Ms. Howland and the Johnsons voluntarily dismissed their claims against Mr. Henderson, leaving Signator Investors as the only remaining defendant.

FN4. The trial court did not explicitly state the basis for its decision to grant the Tenn. R. Civ. P. 12.02(6) motion. However, the trial court must have decided that sales of securities, unlike annuities, were not covered by the Tennessee Consumer Protection Act. *Skinner v. Steele,* 730 S.W.2d 335, 338 (Tenn.Ct.App.1987) held that sales of annuities were covered by the Tennessee Consumer Protection Act.

Ms. Howland and the Johnsons engaged Edward O'Neal, a professor at Wake Forest University's Babcock Graduate School of Management, as their expert with regard to Mr. Henderson's advice and the investment products purchased through Signator Investors. Dr. O'Neal is a registered securities advisor and a published author regarding Class B mutual fund shares. He has also appeared as a witness for the SEC in cases involving Class B mutual fund shares. In a deposition given on September 21, 2004, Dr. O'Neal testified that Ms. Howland and the Johnsons paid higher fees by purchasing Class B mutual fund shares than they would have paid had they purchased Class A shares. He also testified that the portfolios Mr. Henderson established for the Johnsons were too aggressive for their stated investment goals and that the annuity purchased for Ms. Howland was unsuitable because it required more fees but offered no additional tax savings than those afforded by her existing Individual Retirement Account.

On October 8, 2004, Signator Investors filed a motion for summary judgment to dismiss the remaining claims of Ms. Howland and the Johnsons. One week later, it filed a second motion requesting the trial court to exclude Dr. O'Neal's expert opinions. Following a hearing, the trial court entered an order on November 12, 2004, granting both motions without explanation. On this appeal, Ms. Howland and the Johnsons take issue with the Tenn. R. Civ. P. 12.02(6) dismissal of their Tennessee Consumer Protection Act claims, the exclusion of Dr. O'Neal's testimony, and the summary judgment dismissing their remaining claims.

## II.

## The Applicability of the Tennessee Consumer Protection Act to the Sale of Securities

Ms. Howland and the Johnsons take issue with the trial court's dismissal of the Tennessee Consumer Protection Act claims. They insist that the trial court erred by determining that these claims failed to state a claim upon which relief can be granted because the Act does not apply to conduct connected with the sale of securities. Signator Investors, citing federal court decisions interpreting the Tennessee Consumer Protection Act, responds that the trial court's conclusion is correct. We have determined that the trial court erred by concluding that the Tennessee Consumer Protection Act does not apply to conduct surrounding the marketing or sale of securities.

### A.

***4** The Tennessee Consumer Protection Act was enacted in 1977 [FN5] to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce...." Tenn.Code Ann. § 47-18-102(2). It is expressly remedial. Tenn.Code Ann. § 47-18-115; *Tucker v. Sierra Builders,* 180 S.W.3d 109, 115 (Tenn.Ct.App.2005). Therefore, the Act should be construed liberally and broadly to accomplish its purposes. Tenn.Code Ann. § 47-18-102; *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 926 (Tenn.1998); *Ganzevoort v. Russell,* 949 S.W.2d 293, 297 (Tenn.1997); *Keith v. Howerton,* 165 S.W.3d 248, 253 (Tenn.Ct.App.2004).

FN5. Act of May 19, 1977, ch. 438, § 1 1977 Tenn. Pub. Acts 1107 (codified as amended at Tenn.Code Ann. § 47-18-101 to -116 (2001 & Supp.2005)).

The coverage of the Tennessee Consumer Protection Act is far broader than the scope of common-law actions for deceit. *Tucker v. Sierra Builders,* 180 S.W.3d at 115. The Act applies to all unfair or deceptive acts or practices affecting trade or commerce [FN6] that do not fit within one of the exceptions in Tenn.Code Ann. § 47-18-111. Thus, unless preempted or otherwise expressly superseded by federal or state law, the remedies available under the Act are expressly "cumulative and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

supplementary" to other available legal remedies. Tenn.Code Ann. § 47-18-112; *Gaston v. Tenn. Farmers Mut. Ins. Co.,* 120 S.W.3d 815, 822 (Tenn.2003); *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 926.

FN6. Tenn.Code Ann. § 47-18-104(a), (b)(27). The Act broadly defines "trade" and "commerce" to include "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn.Code Ann. § 47-18-103(11). The Act contains similarly broad definitions of "goods" and "services." Tenn.Code Ann. § 47-18-103(5), (10).

**B.**

Notwithstanding the Tennessee Consumer Protection Act's broad language, Tennessee's state courts and the federal courts in Tennessee construing Tennessee law have thus far declined to apply the Act to any act or practice related to the marketing or sale of securities. The United States District Court for the Middle District of Tennessee first addressed this issue in 1989. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309 (M.D.Tenn.1989). After noting that Tennessee courts had not yet addressed the issue, the district court stated that it would make an "Erie-guess" regarding how the Tennessee Supreme Court would decide the question. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. at 1322. The district court then concluded that the Tennessee Supreme Court would decline to apply the Tennessee Consumer Protection Act to conduct relating to the marketing or sale of securities for two reasons. First, the district court, citing Tenn.Code Ann. § 47-18-115,[FN7] surmised that the Tennessee Supreme Court would be heavily influenced by the fact that federal courts had not construed the Federal Trade Commission Act to apply to transactions involving securities. Second, the district court, relying on a decision by the Supreme Court of Massachusetts, noted that it was unlikely that the Tennessee General Assembly would have intended the Act to apply to securities in light of the "preeminence of federal law in the field of securities regulation." *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. at 1324-25.

FN7. Tenn.Code Ann. § 47-18-115 provides that the courts should construe the Tennessee Consumer Protection Act "consistently" with the interpretation of the Federal Trade Commission and the federal courts of Section 5(A)(1) of the Federal Trade Commission Act [15 U.S.C.A. § 45(a)(1) (West 1997].

***5** Federal courts in Tennessee have, almost without exception,[FN8] followed the *Nichols* decision. *Joyner v. Triple Check Fin. Servs.,* 782 F.Supp. 364, 368 (W.D.Tenn.1991); *Hardy v. First Am. Nat'l Bank, N.A.,* 774 F.Supp. 1078, 1084 (M.D.Tenn.1991); *French ex rel. Pickard v. Wilgus,* 742 F.Supp. 434, 436-37 (M.D.Tenn.1990). Surprisingly, Tennessee's courts have likewise followed the *Nichols* decision without any independent analysis, even though state courts are not bound by decisions of federal courts construing state law.[FN9] *DePriest v. 1717-19 West End Assocs.,* 951 S.W.2d 769, 774 (Tenn.Ct.App.1997); *Davidson v. Davidson Corp.,* No. 01A01-9301-CH-00017, 1993 WL 295024, at *6 (Tenn.Ct.App. Aug.4, 1993), *perm. app. denied* (Tenn. Feb. 7, 1994).

FN8. The lone exception is a decision by the United States Bankruptcy Court in Memphis holding that the Tennessee Consumer Protection Act applied to commodities futures contracts. The decision did not mention the *Nichols* case. *Cannon v. J.C. Bradford & Co. (In re Cannon),* 230 B.R. 546, 584-85 (Bank.W.D.1999), *rev'd on other grounds,* No. 99-2605 G/A, 2000 WL 34400479 (W.D.Tenn. Mar.31, 2000).

FN9. *Townes v. Sunbeam Oster Co.,* 50 S.W.3d 446, 452 (Tenn.Ct.App.2001); *State ex rel. Elvis Presley Int'l Mem. Found. v. Crowell,* 733 S.W.2d 89, 97 (Tenn.Ct.App.1987).

Ms. Howland and the Johnsons suggest that the *Nichols* decision has sent the law "spinning off in the wrong direction." [FN10] Based on the manner in which the Tennessee Supreme Court currently approaches issues regarding the scope of the Tennessee Consumer Protection Act, they insist that the Court would hold that the Act applies to transactions involving the marketing, purchase, and sale of securities. We agree.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN10. In *Nichols,* the District Court had dismissed the argument of the Attorney General and Reporter that the Tennessee Consumer Protection Act applied to transactions involving securities by noting that "[a] maladroit analogy can send the law spinning off in the wrong direction." *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. at 1323.

**C.**

In 1998, the Tennessee Supreme Court was asked to determine whether the Tennessee Consumer Protection Act applied to the claims practices of insurance companies. Despite the fact that this court had held eleven years earlier that the Act applied to the marketing and sale of single premium deferred annuities, [FN11] several insurance companies argued that the Act does not apply to the insurance industry because the industry was heavily regulated under state law and because state law provided a specific remedy for refusing to pay claims in bad faith. The court concluded that the Tennessee Consumer Protection Act applied to the acts and practices of insurance companies. *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 926.

FN11. *Skinner v. Steele,* 730 S.W.2d at 338.

There are undoubtedly differences between the insurance industry and the securities industry. This difference was noted by the district court in *Nichols* and was the chief justification for the district court's decision to brush aside our *Skinner v. Steele* decision.[FN12] It is not the holding in *Myint v. Allstate Ins. Co.* that is important in this case; it is the court's reasoning. The court, noting the broad remedial purposes of the Tennessee Consumer Protection Act, adopted a two-step approach for determining whether a particular act or practice is covered by the Act. First, the court examined the statutes regulating the insurance business to determine whether there was any indication that they were intended to provide the exclusive remedy for unfair or deceptive acts or practices in the sale of insurance. *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 924-25. Second, the court examined the Tennessee Consumer Protection Act itself to determine whether the challenged conduct was beyond the scope of the Act. *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 925-26. After this analysis, the court concluded that "the mere existence of comprehensive insurance regulations does not prevent the Consumer Protection Act from applying to the acts or practices of an insurance company." *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 926. We will employ the *Myint* two-step analysis in this case.

FN12. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. at 1323.

***6** We have examined the federal and state statues and regulations governing the sale of securities. While these statutes are comprehensive and detailed, we find no provision in them that can reasonably be construed as limiting the remedies available to consumers who purchase securities to the remedies provided in the securities laws. Likewise, we find no provision that states the Tennessee Consumer Protection Act or similar Acts passed by other states do not apply to marketing or sale of securities. Finally, we find no precedent for the notion that the federal regulation of securities is so pervasive that it preempts state consumer protection statutes.

Some courts addressing this issue have placed great weight on the interpretive principle that general consumer protection statutes should give way to more specific statutes regulating securities. *See, e.g. Jackson v. John Hancock Fin. Servs., Inc.,* No. Civ.A. 04-2500-CM, 2005 WL 2293603, at *9 (D.Kan. Sept.20, 2005). Tennessee courts recognize that a specific statute will apply rather than a general statute when there is a conflict between the two statutes. *Arnwine v. Union County Bd. of Educ.,* 120 S.W.3d 804, 809 (Tenn.2003); *Brewer v. Lincoln Brass Works, Inc.,* 991 S.W.2d 226, 229-30 (Tenn.1999); *In re Harris,* 849 S.W.2d 334, 337 (Tenn.1993). Thus, in this context, the key inquiry is whether a conflict exists between the operation and purposes of the statutes regulating the marketing and sale of securities and the Tennessee Consumer Protection Act.

The Tennessee Supreme Court has emphasized that Tenn.Code Ann. § 47-18-112 reflects the Tennessee General Assembly's desire to make the remedies available under the Tennessee Consumer Protection Act broadly available to all consumers, including consumers who have other remedies under other regulatory schemes. *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 926 (holding that persons filing insurance claims may pursue remedies under a "trilogy of statutes."). In addition, the Act itself contains an explicit safeguard against conflicts by excluding from its coverage "acts or transactions required or specifically authorized under laws administered by ... any authority of this state or of the United States."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tenn.Code Ann. § 47-18-111(a)(1).

The exclusion in Tenn.Code Ann. § 47-18-111(a)(1) should not be read so broadly that it undermines the remedial purpose of the Tennessee Consumer Protection Act. The exclusion has never been construed to permit businesses from engaging in unfair or deceptive acts or practices unless these acts or practices are required or specifically permitted by law. *Smith v. First Union Nat'l Bank of Tenn.,* 958 S.W.2d 113, 116-17 (Tenn.Ct.App.1997) (holding that the bank was expressly authorized by state law to engage in the complained of acts); *Skinner v. Steele,* 730 S.W.2d at 337 (holding that Tenn.Code Ann. § 47-18-111(a)(1) is not specific authorization to engage in unfair or deceptive acts or practices).

***7** Signator Investors has failed to point out how the goals, purposes, or operation of the Tennessee Consumer Protection Act conflict with the goals, purposes, or operation of the federal and state statutes and regulations governing the marketing or sale of securities. We have examined these statutes and regulations, as well as the decisions construing them, and have failed to identify any cogent reasons why providing more than one remedy to persons who have been harmed by unfair or deceptive acts or practices in the marketing or sale of securities is a bad idea. Therefore, we conclude that neither the federal nor the state statutes regulating the marketing or sale of securities provide exclusive remedies for unfair or deceptive acts or practices in connection with the marketing or sale of securities.

Having determined that remedies available to consumers under the federal or state securities laws are not exclusive, we turn to the question of whether conduct regarding the marketing or sale of securities is covered by the Tennessee Consumer Protection Act. It is significant that the Act does not explicitly exclude securities from its coverage. *Myint v. Allstate Ins. Co.,* 970 S.W.2d at 925 (noting that the omission of an act or practice from the list of exempt acts or practices in Tenn.Code Ann. § 47-18-111 "strongly indicates that no such exemption was intended"). Therefore, judicially grafting an exemption for securities onto the Act would frustrate the purposes of the Act expressed in Tenn.Code Ann. § 47-18-102(2).

Securities are "goods" for the purposes of the Tennessee Consumer Protection Act,[FN13] and investment counseling and advice is likewise a "service." [FN14] Accordingly, offering securities for sale and providing investment counseling are consumer transactions.[FN15] The Act explicitly proscribes unfair or deceptive acts or practices in connection with consumer transactions. Tenn.Code Ann. § 47-18-104(a), (b)(27). Following the Tennessee Supreme Court's reasoning in *Myint v. Allstate Ins. Co.,* we have determined that acts or practices in connection with the marketing or sale of securities are covered by the Tennessee Consumer Protection Act.[FN16] Therefore, the trial court erred by granting Signator Investors' motion to dismiss.

FN13. Tenn.Code Ann. § 47-18-103(5) defines "goods" as "tangible chattels ... bought ... for use by an individual primarily for personal, family, or household purposes...."

FN14. Tenn.Code Ann. § 47-18-103(10) defines "services" as "any work ... or services including services furnished in connection with the sale ... of goods...."

FN15. Tenn.Code Ann. § 47-18-103(11) defines "trade," "commerce," or "consumer transaction" as "the advertising, offering for sale ... any goods, services, or property, tanigble or intangible, real, personal, or mixed...."

FN16. We note that the United States District Court observed in *Nichols* that Tennessee's courts had the prerogative to "place Tennessee in a minority of one" with regard to applying its consumer protection statutes to transactions involving securities. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. at 1325. During the intervening seventeen years, at least six other states appear to have held that their unfair and deceptive trade practices statutes apply to the marketing, sale, or purchase of securities. *Wafra Leasing Corp.1999-A-1 v. Prime Capital Group,* 204 F.Supp.2d 1120, 1124 (N.D.Ill.2002) (applying Illinois law); *First State Bank of Floodwood v. Jubie,* 86 F.3d 755, 758 (D.Minn.1995) (applying Minnesota law); *MBank Fort Worth, N.A. v. Tans Meridian,* 625 F.Supp. 1274, 1277-80 (N.D.Tex.1985), *aff'd in part and reversed in part,* 820 F.2d 716 (5th Cir.1987) (applying Texas law); *State ex rel. Miller v. Pace,* 677 N.W.2d 761, 770-71 (Iowa 2004); *Scalp & Blade, Inc. v. Advest, Inc.,* 281 A.D.2d 882, 722 N.Y.S.2d 639, 641

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(App.Div.2001); *Frizzell v. Cook,* 790 S.W.2d 41, 47 (Tex.App.1990); *LaSage v. Norwest Bank Calhoun-Isles, N.A.,* 409 N.W.2d 536, 539 (Minn.Ct.App.1987); *State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 667 P.2d 1304, 1307 (Ariz.1983); *but see Gray v. Seaboard Securities, Inc.,* 14 A.D.3d 852, 788 N.Y.S.2d 471, 472-73 (App.Div.2005); *Portland Sav. & Loan Ass'n v. Bevill, Bresler & Schulman Gov't Securities, Inc.,* 619 S.W.2d 241, 245 (Tex.Civ.App.1981).

## III.

## The Exclusion of Dr. O'Neal's Expert Opinions

Ms. Howland and the Johnsons also take issue with the trial court's decision to exclude Dr. O'Neal's expert opinions regarding Mr. Henderson's investment advice. They insist that Dr. O'Neal demonstrated that he was qualified to provide expert testimony, that his methodology was not inherently suspect, and that his opinions would substantially assist the trier of fact. Signator Investors responds that the trial court applied the standards in Tenn. R. Evid. 702 and 703 correctly and properly excluded Dr. O'Neal's testimony. We have determined that Dr. O'Neal's testimony meets all the requirements of Tenn. R. Evid. 402, 702, and 703.

### A.

***8** The principles governing the admissibility of expert testimony are the same during pretrial proceedings as they are at trial. *Travis v. Ferraraccio,* No. M2003-00916-COA-R3-CV, 2005 WL 2277589, at *5 (Tenn.Ct.App. Sept.19, 2005) (No Tenn. R.App. P. 11 application filed). Specifically, expert testimony must satisfy the relevancy test of Tenn. R. Evid. 402 [FN17] and the strictures of Tenn. R. Evid. 702 and 703.[FN18] *Brown v. Crown Equip. Corp.,* 181 S.W.3d 268, 273-74 (Tenn.2005); *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 264 & n. 8 (Tenn.1997); *DeVore v. Deloitte & Touche,* No. 01A01-9602-CH-00073, 1998 WL 68985, at *9 (Tenn.Ct.App. Feb.20, 1998) (No Tenn. R.App. P. 11 application filed).

FN17. Tenn. R. Evid. 401 provides as follows: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 402 states that "[a]ll relevent evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."

FN18. Tenn. R. Evid. 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 703 reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

In current parlance, a trial court acts as a gatekeeper with regard to the admissibility of expert testimony. The objective of the gatekeeping function is to assure (1) that the expert's testimony is based on the same intellectual rigor that is expected of persons engaged in the relevant field of endeavor, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999); *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 275 and (2) that the expert's testimony will substantially assist the trier of fact. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d at 264; *Boles v. Nat'l Dev. Co.,* 175 S.W.3d 226, 235 (Tenn.Ct.App.2005).

Acting as the gatekeeper, whether during pretrial proceedings or at trial, is a discretionary endeavor. Accordingly, appellate courts review a trial court's decisions regarding the competency of experts and the relevance of their testimony, no matter when made, using the "abuse of discretion" standard. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *Mercer v. Vanderbilt*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Univ.,* 134 S.W.3d 121, 131 (Tenn.2004); *Travis v. Ferraraccio,* No. M2003-00916-COA-R3-CV, 2005 WL 2277589, at *6. This review constraining standard [FN19] does not permit the appellate courts to substitute their discretion for the trial court's. *Henry v. Goins,* 104 S.W.3d 475, 479 (Tenn.2003); *State ex rel. Vaughn v. Kaatrude,* 21 S.W.3d 244, 248 (Tenn.Ct.App.2000). Thus, appellate courts cannot reverse a trial court's decision governing the admissibility of evidence unless the trial court has applied an incorrect legal standard or has reached an illogical or unreasonable decision that causes injustice to the complaining party. *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 273.

FN19. *Richardson v. Spanos,* 189 S.W.3d 720, 725 (Tenn.Ct.App.2005).

**B.**

Although the record is unclear, we presume that Signator Investors took issue in the trial court with the trustworthiness and reliability of Dr. O'Neal's testimony.[FN20] On appeal, Signator Investors insists that Dr. O'Neal's opinions are not reliable for two reasons. First, Signator Investors argues that Dr. O'Neal ignored undisputed material facts in forming his opinion. Second, it argues that Dr. O'Neal's methodology is suspect. Apparently the trial court agreed with one or both of these arguments. We do not.

FN20. Despite the clear requirements of Tenn. R. Civ. P. 7.02(1), Signator Investors' motion does not state with particularity the reasons for excluding Dr. O'Neal's testimony. While these reasons may have been included in an accompanying memorandum of law, the memorandum is not part of the record on appeal by virtue of Tenn. R.App. P. 24(a). The trial court did not give reasons for its decision to exclude Dr. O'Neal's testimony.

***9** Dr. O'Neal stated in his deposition that his opinion regarding Mr. Henderson's investment recommendations was based on Annie Johnson's needs and investment objectives and that his opinion would be different if Mr. Henderson's recommendations were responding to Linda Johnson's needs. Signator Investors insists that this statement undermines Dr. O'Neal's testimony because is was "undisputed" that the Johnsons told Mr. Henderson that the investments were to be used solely to benefit Linda Johnson. This fact is far from undisputed.

Announcing that a fact is undisputed does not make it so. Even a cursory examination of the record quickly reveals that the substance of the conversation between Mr. Henderson and the Johnsons is hotly contested. While Mr. Henderson insists that the Johnsons told him that the investments were intended solely to benefit Linda Johnson, the Johnsons have, with equal vigor and certainty, testified that they told Mr. Henderson quite clearly that the investments were intended to benefit Annie Johnson.

These are the sort of factual disputes that should not be addressed at the summary judgment stage. The Johnsons are entitled to present expert testimony based on the facts as they believe them to be. The expert's opinion, especially its factual predicate, may then be tested in the crucible of vigorous cross-examination and countervailing proof. *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 275; *State v. Stevens,* 78 S.W.3d 817, 835 (Tenn.2002). The Johnsons should not be denied the opportunity to have the trier of fact determine both the credibility of their version of the facts and the appropriate weight to be given to their expert's testimony. If the Johnsons' evidence proves to be insufficient, the trial court may then grant a directed verdict. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d at 265.

Signator Investors also objects to Dr. O'Neal's testimony on the ground that his methodology is suspect. Almost ten years ago, the Tennessee Supreme Court identified five "non-exclusive" factors for determining the admissibility of an expert's testimony. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d at 265. [FN21] Last year, the court added two additional factors. The first is the expert's qualifications for testifying on the subject at issue. This factor is particularly important when the expert's personal experience is an essential part of his or her methodology or analysis. *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 274. The second factor is the connection between the expert's knowledge and the basis for the expert's opinion. This factor enables the courts to make sure that no analytical gap exists between the expert's knowledge and the basis for his or her opinion. *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 275.

FN21. These factors include: (1) whether scientific evidence has been tested and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation." *McDaniel v. CSX Transp., Inc.* 955 S.W.2d at 265.

This record reveals that Dr. O'Neal is far from a "marginally qualified full-time expert." [FN22] His education, academic experience, and other employment render him well qualified to give an expert opinion regarding the suitability of investment advice offered by a broker or investment advisor. His methodology relies both on mathematics and on his knowledge of the importance of risk analysis in investment decisions.

FN22. The Tennessee Supreme Court has admonished the courts to distinguish between "the marginally qualified full-time expert witness ... and 'the highly credentialed expert who has devoted her [or his] life's work to the actual exercise of the methodology upon which her [or his] testimony is based.' "*Brown v. Crown Equip. Corp.,* 181 S.W.3d at 274.

***10** Investment advice regarding the purchase or sale of stocks, mutual funds, annuities, or other investments is not an exact science. There are certainly subjective elements in making investment decisions. Detailed financial analysis is not a skill possessed by many members of the public. Indeed, this is the reason why investors seek the assistance of financial advisors. It is hardly illogical to assume, therefore, that the average trier of fact would find an expert's opinion regarding the appropriateness of investment advice in light of stated investment goals to be quite helpful when an investor is taking issue with the advice he or she received.

Legal claims based on the suitability of investment advice are not unusual in Tennessee, *see, e.g., City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d 729, 735-37 (Tenn.Ct.App.1996), or in other states. *See, e.g., Minneapolis Employees Retirement Fund v. Allison-Williams Co.,* 519 N.W.2d 176, 179-80 (Minn.1994); *Boettcher & Co. v. Munson,* 854 P.2d 199, 208-09 (Colo.1993). These claims generally require the investor to allege with specificity which investments were involved and why they were unsuitable. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 494 (6th Cir.1990). It is difficult to envision how an investor can prevail in cases of this sort without expert testimony based on methodology similar to Dr. O'Neal's. Indeed, courts admit this sort of testimony with some regularity. *See, e.g. Devonshire v. Johnston Group First Advisors,* 166 Fed. Appx. 811, 813 (6th Cir.2006); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454, 461 (9th Cir.1986); *City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d at 735-736.

Based on the record before us, we conclude that Dr. O'Neal possesses the education and experience that qualifies him to render an expert opinion regarding the adequacy of the investment advice Mr. Henderson provided to Ms. Howland and the Johnsons. We have also determined that Dr. O'Neal's methodology is sound and reflects the same intellectual rigor that would be required and expected of investment advisors competently practicing their profession, and we find that Dr. O'Neal's testimony would substantially assist the triers of fact. Accordingly, we find that Dr. O'Neal's testimony meets the requirements of Tenn. R. Evid. 402, 702, and 703.

## IV.

## The Dismissal of Ms. Howland's and the Johnsons' Remaining Claims

As a final matter, Ms. Howland and the Johnsons take issue with the trial court's decision to dismiss their remaining claims against Signator Investors. They assert that they have made out a prima facie case with regard to their common-law fraud and misrepresentation, negligence, and breach of fiduciary duty claims. Signator Investors insists that it is entitled to a dismissal of these claims as a matter of law because of the undisputed evidence that Mr. Henderson provided Ms. Howland and the Johnsons with a prospectus regarding the Class B mutual fund shares before they purchased them. We disagree.

***11** Depending on the circumstances, a stock broker's or financial advisor's relationship with his or her client may be far from a simple arm's length relationship. The courts have not been of a single mind whether fiduciary duties inhere in every relationship between a stock broker or investment advisor and his or her client. While several courts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have suggested that a broker always owes his or her client some form of fiduciary obligation, [FN23] others have suggested that the resolution of the question depends on the manner in which the investment decisions have been reached and the manner in which the transactions for the account have been executed. The scope of the broker's or investment advisor's fiduciary obligations depend on the degree of discretion the client has entrusted to the broker or advisor. *Patsos v. First Albany Corp.,* 433 Mass. 323, 741 N.E.2d 841, 849 (Mass.2001). If the transaction is non-discretionary and at arm's length, i.e., a simple order to buy or sell a particular stock, the relationship does not give rise to general fiduciary duties.[FN24] However, if the client has requested the broker or advisor to provide investment advice or has given the broker discretion to select his or her investments, the broker or advisor assumes broad fiduciary obligations that extend beyond the individual transactions. *De Kwiatkowski v. Bear Stearns & Co.,* 306 F.3d 1293, 1308 (2d Cir.2002); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1481-82 (6th Cir.1989); *Honeycutt v. First Federal Bank,* 278 F.Supp.2d 893, 898 (W.D.Tenn.2003); *Ascot Funds Ltd. v. UBS PaineWebber, Inc.,* 28 A.D.3d 313, 814 N.Y.S.2d 36, 36 (App.Div.2006); *Cowburn v. Leventis,* 366 S.C. 20, 619 S.E.2d 437, 447 (S.C.Ct.App.2005); *Patsos v. First Albany Corp.,* 741 N.E.2d at 850-51.

FN23. *Romano v. Merrill Lynch, Pierce, Fenner & Smith,* 834 F.2d 523, 530 (5th Cir.1987); *Thomson McKinnon Securities, Inc. v. Moore's Farm Supply, Inc.,* 557 F.Supp. 1004, 1011 (W.D.Tenn.1983); *O'Malley v. Boris,* 742 A.2d 845, 849 (Del.1999).

FN24. The duties associated with a non-discretionary account are discussed in *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich.1978).

When a stock broker or financial advisor is providing financial or investment advice, he or she is required to exercise the utmost good faith, loyalty, and honesty toward the client. The broker or advisor implicitly represents to the client that he or she has an adequate basis for the opinions or advice being provided. *Hanly v. S.E.C.,* 415 F.2d 589, 596-97 (2d Cir.1969); *Univ. Hill Found. v. Goldman,* 422 F.Supp. 879, 893 (S.D.N.Y.1976). He or she also is required to disclose facts that are material to the client's decision-making. [FN25] *See Marshall v. Sevier County,* 639 S.W.2d 440, 446 (Tenn.Ct.App.1982); *Heard v. Miles,* 32 Tenn.App. 410, 418-21, 222 S.W.2d 848, 851-52 (1949). *See also Conway v. Icahn Co.,* 16 F.3d 504, 510 (2d Cir.1994); *Joel Lieb v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 647 F.2d 165 (6th Cir.1981) (unpublished table decision).

FN25. The Tennessee Securities Act of 1980 provides that brokers are liable for misrepresentations by omission in the same way that they would be liable for affirmative misrepresentations. Tenn.Code Ann. § § 48-2-121(a)(2),-122(a)(1)(B) (2002 & Supp.2005).

Signator Investors insists that Mr. Henderson fully discharged the disclosure obligation by furnishing Ms. Howland and the Johnsons with a prospectus regarding the Class B mutual fund shares. While providing a prospectus may satisfy the disclosure requirements in SEC Rule 10b-5(b), it does not necessarily foreclose other federal claims. *Benzon v. Morgan Stanley Distribs., Inc.,* 420 F.3d 598, 611 (6th Cir.2005); *Bruschi v. Brown,* 876 F.2d 1526, 1531 (11th Cir.1989) (recognizing the existence of a claim when an investor's loss results from the risky nature of an investment that a broker induced the investor to purchase by representing that the investment was safe). By the same token, we decline to find that providing a client with a prospectus is a complete defense, as a matter of law, to state claims that the stock broker or investment advisor misrepresented facts or failed to disclose facts material to his or her client's investment decisions.[FN26]

FN26. Of course, clients asserting claims based on fraudulent or negligent misrepresentations must prove that they relied reasonably on the broker's or financial advisor's representations regarding the investment. *Robinson v. Omer,* 952 S.W.2d 423, 427 (Tenn.1997); *Hardcastle v. Harris,* 170 S.W.3d 67, 83 n. 25 (Tenn.Ct.App.2004). The fact that an investor was furnished a prospectus disclosing detailed information regarding the investment will play a significant role in determining whether the investor's reliance on the representations of the broker or financial advisor was reasonable.

***12** Ms. Howland and the Johnsons allege that Mr. Henderson recommended that they make investments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

he knew to be risky despite the fact that they told him they wanted to make safe, conservative investments. They also allege that Mr. Henderson received a larger commission on these investments while they sustained significant financial losses as a result of Mr. Henderson's representations that their investments were safe. The evidence they have submitted to support these claims is sufficient to withstand Signator Investors' motion for summary judgment. Therefore, we find that the trial court erred by dismissing their claims at this stage of the proceeding.

## V.

We vacate the orders dismissing Ms. Howland's and the Johnsons' claims against Signator Investors and remand the case for further proceedings consistent with this opinion. We tax the costs of this appeal to Signator Investors, Inc. for which execution, if necessary, may issue.

Tenn.Ct.App.,2006.
Johnson v. John Hancock Funds
Slip Copy, 2006 WL 1864802 (Tenn.Ct.App.), Blue Sky L. Rep. P 74,583

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.